The Chancellor.
The suit below was upon a promis • sory note, dated the 8th of May, 1812, fbr 750 dollars, payable in 100 days.
This note was one of twelve notes, given by M, $■ W. Ward to the plaintiff, and payable at different periods, the whole of them amounted to 9,000 dollars, and were all given at the same time. Instead of cash, the plaintiff gave in exchange for those notes, four notes of his own, amounting to the same sum of 9,000 dollars, payable at more distant periods. Upon this exchange of notes the plaintiff received a commission of 2 and 1-2 per cent., amounting to 225 dollars, for making the exchange. This commission exceeded the legal rate of interest upon four notes of the plaintiff, supposing them to have been intended as a loan of so much cash. It amounted to a rfite of interest of twelve percent. ; and the question is, whether this commission was not ano *374 ther name for interest taken on a loan of credit, instead of a ]oan 0f cash. The statute of usury applies to any loan at a greater rate of interest for forbearance, than seven per cent. “ of any moneys, wares, merchandize, or other things, whatsoever,” The statute, therefore, applies as well to a loan of notes on usurious interest, as to a loan of cash.
The jury have found the fact submitted to them by the judge at the trial, that the exchange of the notes was for the purpose of raising money at a greater rate of interest than seven per cent, per annum. This fact appears to me to establish, beyond all contradiction, the charge of usury -set up by the defendant. If that was the object of the parties, (and the jury have so found it,) then it was a shift or contrivance to get rid of the statute of usury, and such a 'shift or contrivance no court of justice can tolerate.
But the plaintiff offered to show upon the trial that the charge of a commission of two and a half per cent, upon the exchange of notes was within the understanding, usage, -and custom of merchants, and this evidence was overruled ■ as immaterial and useless. ■
The question on the competency of this evidence ap* ..pears to be the only point in the case.
If the evidence offered was not, in judgment of law, material upon the point of the shift or contrivance to evade the statute, then it was improper, and ought to have been rejected.
This point appears to me as clear and self evident as the -ether.
It was observed by Lord Chancellor Loughborough, in the case Ex parte Aynsworth, (4 Vesey, 678.) that the custom of a trade to take a discount above five per cent., (or the legal rate of interest in England,) cannot authorise a greater demandaban five per cent. It is perfectly idle to talk of a custom of merchants to take a commission above the legal rate of interest-on the-exchange-of notes. The custom of merchants is ndt applicable ‘to such a case. It is not a matter of trade and commerce, within the meaning of the law merchant. And if there were such a local usage in New-York it would be null and void, and could not be set up as a cover -or pretext to trample down the law of the land. The mo *375 ney lenders throughout the country might as well set up a practice of their own, and then plead it in bar of of the statute. The cases (2 Term Rep. 52. 1 Bos. & Pull. 144. 17 Vesey, 332. 1 Maule Selw. 56.) of the allowance of a reasonable sum beyond interest to country bankers, for re-exchange and remittance of the money from a distance, and the allowance of a reasonable sum for incidental expenses or extra trouble in the particular case, and when there was no colour of usury, have no application, for they are all founded on distinct principles. Here was no remittance of money from one place to another, and no extraordinary expenses incurred. The commission of two and a half per cent, was not charged on any such account; here was nothing more than a simple exchange of notes, instead of a loan of cash. The compensation required for the loan was twelve per cent.; it was exacted in the name of a commission, instead of interest, and this was a clear evasion of the statute against usury.
The usage, therefore, that, was offered to be shown would not have been of any avail, if it had been proved, for it would have been an illegal usage, and the evidence in favour of it was properly overruled.
This, then, being a clear case of usury, it is not necessary for me to observe, that it is the duty of the Court to give full effect to the statute made to suppress it. The counsel who argued this cause, on the part of the plaintiff, while he acknowledged this to be our duty, yet, at the same time very ingeniously arraigned the justice and policy of the law. The effect of the attack, (if well founded,) would naturally be to induce us to look with an unfavourable eye upon every plea under the statute of usury, and to lay hold of any pretext or argument, however specious, such, for instance, as that these were commissons only, and not interest, or that this was the usage of the merchants, or that here was only the loan of notes, in order to free ourselves from the bondage of the law. But this, I apprehend, we are not at liberty to do. Asjlong as the statute exists in full force, we are bound in all honest policy to give it a fair and manly support. I will even go further, and say, that I have not been able to perceive the injustice, and *376 impolicy of laws regulating the interest of money; and as-the statute of usury has been assailed in oúr very presence, I hope I may be indulged with a word or two in its defence. If we look back upon history, we shall find that there is scarcely any people, ancient or modern, that have not had usury laws. I believe there is not a nation in Europe at this day without them. In ancient Rome, according to Tacitus, {Ann. lib. 6. ch. 1G.) nsury was discouraged in the early , period of the Republic by the Twelve Tables, which reduced interest to one pey cent. It was afterwards lowered to one half per cent., and finally abolished by the clamours of the people. It was revived in the ages of commerce and luxury, but placed under necessary restrictions. Four or six per cent, was the ordinary interest; eight per cent, was allowed for the convenience of commerce, and 12 per cent, might be taken for maritime hazards, by the laws of Justinian, but the practice of more exorbitant interest.was severely restrained.
/ The Romans, through the greater part of their history, had the deepest abhorrence of usury. They did not derive their objection to usury from the prohibitions in the Mosaic law, nor did they hold it sinful, as the learned Fathers of the early and middle ages of the church have done, forthey.knew nothing of that law. ■''í’he Roman lawgivers and jurists acted from views of public policy. They found, by their own experience, that unlimited usury led to unlimited oppression, and that the extortion of the creditor, and the resistance of the debtor, were constantly agitating and disturbing the public peace. </
But it is not only the civilized and commercial nations of modern Europe, and the sage lawgivers of ancient Rome, that have regulated the interest of money. It will be deemed a little singular, that the same voice against usury should have been raised in the laws of China, in the Hindu Institutes of Menu, in the Koran of Mahomet, and perhaps,, we may say, in the laws of all nations that we know of, whether Greek or Barbarian.
There is one exception, however, that I ought to notice, and which is supposed to be found in the laws of Solon, given to -the Athenian Republic. Tins celebrated- *377 lawgiver is said to have allowed parties to regulate the rate .of interest by their own contracts. When Solon was called to make laws for Athens, the state was in complete anarchy; and when he was asked, if he had provided the best of laws for the Athenians, he replied, that he had provided the best that their prejudices would admit of. One of his first steps was, to cancel all existing debts, though, according to Plutarch, (Life of Solon,) it is not certain that he proceeded to this violent measure, for many said that he did not cancel debts, but only moderated the interest. And the result of his law allowing interest to regulate itself, I shall give in the words of De Pauw, (Recherches Philosophique sur les Grecs, 5 sect. § 2.) He says, that usage fixed the rate of interest at ,12 per cént. in certain cases, and at 18 per cent, in others, and that “ the Athenians regarded all those who did not conform to this usage as usurers, that is,' as the most vile and the most ignominious of mankind. The public voice which cried against them, and the profound contempt to which they were condemned, formed a punishment so great, that the lawgiver did not deem it necessary to add any other punishment,’’ The usage in this case formed the law.
Now, according to this view of the fact, interest was limited at Athens, as, effectually and as precisely, by this customary law, as it would have been by any penal statute, and the Athenian commonwealth is not to be cited as a real exception to the general practice of mankind.
The principal error which has prevailed oh this subject, is the condemnation of any kind of interest, however small. A host of great names from Aristotle among the Greeks, to the modern civilians, such as Domat and Pothier might be cited, who rank all interest of money under the name of Usury, and condemn it. But the sense of mutual benefit has, on this point, resisted, with equal firmness, the decrees of the church, and the speculations of philosophers, and a regulated and reasonable interest has had the sanction, not only of our own municipal law, but of the most cultivated and enlightened human reason. Grotius, (lib. 2. c. 12. § 20. ■-22.) after discussing the question, whether usury be permitted by the natural and divine law, .concludes, that a reasonable *378 interest may be permitted; and he cites Holland as an instance, in which eight per cent, is the ordinary, and twelve Per centi R>e mercantile interest. But he insists, that interest cannot be rightfully permitted beyond a reasonable limit: Non mordaces sed modice, according to Hemeccius, in his commentary on this passage, and who admits that itr belongs to the discretion of the lawgiver to regulate the quantum of interest. He says further, that in Germany, by imperial ordinances in 1600, and 1654, interest at the rate of five per cent, was allowed, though the canons of the church every where condemned it, and higher interest is now permitted. (Heinec. Elem. Jur. Germ. Lib. 2. tit. 13. § 378. Elem, Jur. civ. secund. Ord. Pand. part 4. lib. 22. tit. l.§ 104. Prolec in Grot, ubi sup.) Puffendorf (Le Droit de la nat. et des gens. lib. 5. ch. 7.) examines the subject at great length, and with great learning, and concludes with his approbation of those civil laws which allow, and regulate interest, but do not permit individuals to take just what their cupidity would demand. Lord Bacon, in one of his moral essays, (No. 41.) has also discussed the question, and examined the arguments for, and against interest, with his usual sagacity, and he concludes, that two things are to be reconciled: “ The one,” to use his own words, “ that the tooth pf usury be grinded, that it bite not too much, the other, that there be left open a means to invite moneyed men to lend for the continuing and quickening of trade;” and he recommends a general rate of interest, say 5 per cent, for ordinary cases, and a higher rate of interest in matters of trade.
Can we suppose, that a principle of moral restraint' of such uniform, and universal adoption, has no good sense in it ? Is it altogether the result of monkish prejudice ? Ought we not rather to conclude, that the provision is adapted to the necessities and the wants of our species, and grows out of the natural infirmity of man, and the temptation to abuse inherent in pecuniary loans. The question of interest arises constantly, and intrudes itself into almost every transaction. It stimulates the cupidity for gain, and sensibly affects the heart, and gradually presses upon the relation of debtor and creditor. Civil government is continually placing guards over the weaknesses, and checks upon the passions *379 of men, and many cases might be mentioned, in which there is, equally with usury laws, an interference of the lawgiver, with the natural liberty of mankind to deal as they please with each other. But no person doubts of the necessity, and salutary efficacy of such checks. On the same principie, that unlimited usury may be permitted, the law ought to allow the creditor to insert in his bond a provision for compound interest, whenever the stipulated interest becomes due, and is not paid. Nay, parties ought to be allowed to agree, that if the condition of a bond be not performed at the day, the penalty shall not only be nominally forfeited, but-literally exacted. 1 should apprehend, that if these things-were to be permitted, there would not be strength enough in the government to support the administration of justice. It is an idle dream to suppose that we are wiser and better than the rest of mankind. Such doctrine may be taught by those who find it convenient to flatter popular prejudice; but the records of our courts are daily teaching us a lesson of more humility. And, I apprehend, it would be perilous in the extreme, to throw aside all the existing checks upon usurious extortion, and abolish, or traduce a law which is founded on the accumulated experience of every age.
The Roman commonwealth, if we may place reliance-upon its earlier history, tried every experiment on this interesting subject. The Romans had no law regulating the interest of money, and left the parties to their own contracts, until the law of the twelve tables, according to Tacitus, or the law of the tribunes, in the year of Rome 398, according to Montesquieu. The consequence was, unceasing quarrels between the patricians and plebeians, and popular secessions to the mons sacer, in which one party pleaded the obligation, and the other the severity of their contracts. Interest was then reduced to the smallest allowance, and finally abolished, which led to a still more frightful usury, until at last, the emperors were obliged to allow, but regulate, and limit the charge of usury. So true it is, according to the President Montesquieu (Esprit des Loix, liv. 22. ch. 21,22.) who has discussed this subject at large, that extreme laws produce extreme evil, les loix extremes dans le bien font naitre le mal extreme. The Romans, at one time, had no laws against *380 usury, and, at another time, they allowed no interest, and these are the extreme laws which this celebrated civilian condemns.
Lord Redesdale said, in 1803, (1 Sch. & Lef. 195. 312.) many years after Jeremy Bentham, to whom the learned counsel referred for an able defence of usury, had first published his letters, that the statute of usury was founded on great principles of public policy. It was intended, he said, to protect distressed men, by facilitating'the means of procuring money on reasonable terms, and by re-. fusing to men who sit idle, as high a rate of interest without hazard, as those can procure who employ money in the hazardous undertakings of trade and manufacture.
I trust that theoretic reformers have not yet attained, on this subject, any decided victory over public opinion. Mr. Bentham contends, that we ought hot so much as to wish “ to see the spirit of projects in any degree repressed.” It may be so; but I hope I may be permitted to wish that the first experiments of his projects may not be made within these walls. The statute of usury is constantly interposing its warning voice between the creditor and the debtor, even in their most secret and dangerous negotiations, and teaches a lesson of moderation to the one, and offers its protecting arm to the other. I am not willing to withdraw such a sentinel. I have been called to witness, in the course of my official life, too many victims to the weakness and to the inflamed passions of men. All sudden and extreme reforms are unwise. We ought not to stretch or to amputate, in order to make our institutions fit exactly to any theory. It is better to follow the course and order of Providence, and suffer our general system of laws, like our habits, to accommodate itself slowly to our necessities, and to vary only with the gradual and almost imperceptible progress of time and experience.
I am accordingly of opinion, that the judgment of the Supreme Court ought to be affirmed.
This being the unanimous opinion of the Court, (exceptMr, Bates, Senator,) it. was therefore; Ordered and adjudged, that the judgment of thy Supreme Court be affirmed, arid *381 that the plaintiff in error pay to the defendant in error, his costs and charges, in and about his defence in this Court; and it is further ordered, that the proceedings, and judgment of this Court be remitted, &c.
Judgment of affirmance.