FRANK FRORER *et al.*

*v.*

THE PEOPLE, for use of the school fund.

*Filed at Springfield June 15, 1892.*

1. "TRUCK STORE" ACT — *held unconstitutional.* Sections 1 and 2 of the act of May 28, 1891, entitled "An act to provide for the payment of wages in lawful money, and to prohibit the truck system, and to prevent deduction from wages, except for lawful money actually advanced," which attempts to prohibit persons engaged in any mining or manufacturing business from keeping a "truck store," or being interested in or controlling any store for the furnishing of supplies, tools, clothing, provisions or groceries to their employes while so engaged in mining or manufacturing, and imposing a fine for any violation thereof, is in conflict with the constitution, and void.

2. LEGISLATIVE POWER—*to enact laws imposing burdens on specific employments or branches of industry.* It is not competent for the legislature to select operators of mines or manufacturers, and provide that they shall bear burdens not imposed on other owners of property, and prohibit them from making contracts which it is competent for other owners of property or employers of labor to make.

3. In all matters relating to mining and manufacturing wherein they differ from other industrial branches, the legislature has the constitutional power to determine whether any, and, if any, what, statutes shall be enacted for their welfare, and necessarily affecting them alone. But keeping stores and groceries, or supplies of tools, clothing and food, by whatever name, to sell to laborers in mines and manufactories, is entirely independent of mining and manufacturing, and has no tendency to affect the mechanical process of mining and manufacturing. A man may not be prohibited from keeping a "truck store" for the sale of implements of labor, food or clothing merely because of his participating or being interested in a mining or manufacturing business.

4. If the legislature should undertake to provide by law that persons following some lawful trade or employment should not have the capacity to make contracts, or to receive conveyances, or to build such houses as others were allowed to erect, or in any other way make such use of their property as was permissible for others, such act would transcend the bounds of legislative power, even if it did not come in conflict with constitutional provisions.

5. SAME—*to enact remedial laws.* Laws relating to mechanics' liens, ɪd and exemption laws, limitation laws, the Statute of Frauds,

and laws in relation to pleadings, evidence and insolvents, relate not to the power to contract in regard to matters of general right, but to the remedy for enforcing contracts. As to the remedy, the legislature may make such regulations as the public welfare seems to demand, so long as, under pretense of regulating the remedy, it does not impair the right itself.

6. CONSTITUTIONAL LAW — *section 2, article 11, of the constitution.* Laws may be enacted properly, and without infringing section 2 of article 11 of the constitution, which, by reason of peculiar circumstances, may affect some persons or classes of persons, only, who were not before affected by their restrictions; but in such instances the circumstances must be so exceptional as to leave no others affected in precisely the same way upon whom a general law could have effect.

7. SAME—*placing undue burdens on owners of coal mines.* It is not competent, under the constitution, for the legislature to single out owners and operators of coal mines, and provide that they shall bear burdens not imposed on other owners of property or employers of labor, and prohibit them from making contracts which it is competent for other owners of property or employers of labor to make.

8. SAME—*denial of the right to contract is deprivation of liberty and property.* The privilege of contracting is both a liberty and a property right, and if A is denied the right to contract and acquire property in a manner which he has hitherto enjoyed under the law, and which B, C and D are still allowed by the law to enjoy, it will be clear that he is deprived of both liberty and property to the extent that he is denied the right to contract.

9. "DUE PROCESS OF LAW"—*defined.* "Due process of law" does not mean a statute passed for the purpose of working a wrong on the rights of a person or class. Those words are synonymous with the words "law of the land;" and this means general public law, binding upon all the community under all circumstances, and not partial or private laws, affecting the rights of private individuals or classes of individuals.

10. POLICE POWERS—*extent of legislation under.* Under the police power of the State, laws may be enacted imposing new burdens on persons and property, and restricting personal rights of enjoyment of property, when, in the opinion of the General Assembly, the public welfare demands it, under which may be instanced license laws, quarantine laws, laws creating liability for causing death or injury to servants, laws requiring dangerous machinery to be properly guarded and used so as to avoid injury, laws to prevent monopolies, extortion and fraudulent imposition, and also usury laws.

11. But the police power is limited to enactments having reference to the comfort, the safety and the welfare of society, and under its guise a person can not be deprived of a constitutional right. Under it

an adult person of sound mind, laboring under no legal disability, can not be deprived of the right to make contracts in respect to labor and the acquisition of property, under the pretense of giving such person protection.

12. Instructions—*should be limited to questions involved in the trial.* A proposition that the court holds, as a matter of law, that a certain act of the legislature, and each and every section thereof, is illegal and void, will be properly refused as too broad, when some of the sections are not pertinent to the legal question involved.

Appeal from the Circuit Court of Christian county; the Hon. Jesse J. Phillips, Judge, presiding.

Mr. George S. House, and Messrs. Drennan & Hogan, for the appellants:

The constitutionality of a statute is a judicial question, to be determined by reference to the subject matter of the legislation, and its results. *Lake View* v. *Cemetery Co.* 70 Ill. 191; *Mugler* v. *Kansas,* 123 U. S. 623; *Minnesota* v. *Barber,* 136 id. 313.

That this statute deprives persons of liberty and property without due process of law, see *Application of Jacobs,* 98 N. Y. 98; *Butchers' Union Co.* v. *Crescent City Co.* 111 U. S. 746; *Bertholf* v. *O'Reilly,* 74 N. Y. 509; *People* v. *Marx,* 99 id. 377; *People* v. *Gillson,* 109 id. 389; *State* v. *Indiana, etc., Co.* 120 Ind. 575; *State* v. *Addington,* 77 Mo. 110; *Powell* v. *Commonwealth,* 114 Pa. St. 265; *Millett* v. *People,* 117 Ill. 294.

The statute is not justified under the police power. Potter's Dwarris on Stat. 458; *Austin* v. *Murray,* 16 Pick. 121; *Watertown* v. *May,* 109 Mass. 315; *Railway Co.* v. *Jacksonville,* 67 Ill. 40; *Yeazel* v. *Alexander,* 58 id. 254; *Jones* v. *People,* 110 id. 590; *Godcharles* v. *Wigeman,* 113 Pa. St. 431; *State* v. *Goodwillie,* 33 W. Va. 179.

Mr. Joseph C. Creighton, State's Attorney, and Mr. James B. Ricks, for the People:

The constitutional provision prohibiting the deprivation of property is not infringed by a proper regulation of business,

which may render property used to carry on the business less valuable. If the business is still allowed to be carried on, and the property used is allowed to exist, and its possession is not disturbed, the owner can not be said to be deprived of his property. *Munn* v. *People*, 69 Ill. 80.

It is an unquestioned right of the legislature to regulate weights and measures, and to prescribe penalties for a failure to comply in regard to the same. (Starr & Curtis' Stat. chap. 147, sec. 14, p. 2462; Cooley's Const. Lim. 749.) Why have not the law makers the same right with regard to digging coal?

It is the duty of the court to uphold and sustain a statute when the conflict between it and the constitution is not clear. *Newland* v. *Marsh*, 19 Ill. 385.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This is an action of debt, under the act approved May 28, 1891, in force July 1 of that year, entitled "An act to provide for the payment of wages in lawful money, and to prohibit the truck system, and to prevent deduction from wages, except for lawful money actually advanced." The first, second and seventh sections only are pertinent in the present case, and they read as follows:

"Section 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That it shall be unlawful for any person, company, corporation or association now engaged or hereafter to be engaged in any mining or manufacturing business in this State, to engage in or be interested, directly or indirectly, in the keeping of a truck store, or the controlling of any store, shop or scheme for the furnishing of supplies, tools, clothing, provisions or groceries to his, its or their employes while so engaged in mining or manufacturing.

"Sec. 2. Every person, company, corporation or association found guilty of violating section 1 of this act, either by himself, its or their agents, servants or employes or partners, shall be guilty of a misdemeanor for each and every day such

business is done in violation of said section, and on conviction shall be liable to a fine for each offense of not less than fifty (50) nor more than two hundred (200) dollars, to be recovered in the name of the People, for the use of the school funds; and any person having knowledge of the fact that said section has been violated, may make complaint, and cause summons or warrant to be issued.

"Sec. 7. 'Truck' means the payment of wages otherwise than in lawful money, or otherwise than to the full amount earned by the employe."

There are two counts in the declaration. It is alleged in the first count, that "since the first day of July, 1891, and prior to the commencement of the suit, the defendants, as co-partners under the firm name of the Pana Coal Company, were engaged in the mining of coal in said Christian county, and in such business had in their employ divers persons, and that at said time and place the said defendants were interested in the keeping of a certain truck store there situated, for the furnishing of supplies, tools, clothing, provisions and groceries to their said employes, contrary to the form of the statute." In the second count it is alleged that "the said defendants, as co-partners, were engaged in the mining of coal and having in their employ divers persons, all at the time and place aforesaid, and were then and there interested in controlling a scheme for the furnishing of supplies, clothing, provisions and groceries to their said employes, contrary to the form of the statute." The defendants pleaded not guilty, and the cause was, by agreement of the parties, tried by the court without the intervention of a jury.

Upon the trial, and after evidence was submitted, the defendants asked the court to mark as "held" the following among other propositions, submitted in writing:

"*Fourth*—As a matter of law, the court holds that the act of the legislature entitled 'An act to provide for the payment of wages in lawful money, and to prohibit the truck system,

and to prevent the deduction from wages, except for lawful money actually advanced,' approved May 28, 1891, and each and every section thereof, is illegal and void."

But the court declined to hold as thus requested, and found the defendants guilty, and assessed a fine of $50 against them on each count, and gave judgment accordingly. The defendants excepted to the several rulings of the court, and the record of that judgment is brought before us by the appeal of the defendants.

The question whether there is error in this judgment depends upon whether sections 1 and 2, *supra,* are constitutional enactments, and therefore the law of the land, for if they are not, there is no other statute, nor is there any principle of the common law, upon which the judgment can be sustained.

The first section assumes to make it unlawful for a person or a corporation, while in the business of mining or manufacturing, to engage or be interested, directly or indirectly, in keeping or controlling any truck store, shop or scheme for the furnishing of supplies, tools, clothing, provisions or groceries to employes. (Laws of 1891, p. 212.) This is not confined to sales upon credit, nor to sales of articles paid or to be paid for in work, nor are any exceptions made because of any peculiar circumstances or occasions, however urgently the necessities of individuals may require that there should be exception, but it extends, under any and all circumstances, to every keeping or controlling of any store, shop or scheme for furnishing supplies, tools, clothing, provisions or groceries, by the operator of the mine or manufactory, to employes while engaged in mining or manufacturing. While the prohibition includes, by name, only the "person, company, corporation or association engaged in mining or manufacturing," it includes equally within its effect their employes, for the employe is necessarily denied the right to contract with one who is forbidden by the law to possess, for the purpose of contracting with him, the articles about which he wishes to contract.

It would therefore have added nothing to the legal meaning, of this section if it had expressly prohibited the employes from contracting with their employer for the purchase of the property in which it is thus made unlawful for their employer to have any ownership.

We must take judicial notice that employes in mines and manufactories include but a part of those who are employed by others and who depend upon their daily labor for subsistence, for we know, from daily observation, that many thousands are employed in making excavations and embankments for roads, buildings and other improvements, erecting and repairing buildings and various other structures, in the business of transportation, in that of the sale of goods, wares and merchandise, in that of quarrying stone, in that of agriculture, and in that of domestic service, and in all of these branches of industry employers and employes are unaffected by this statute, and such employers may therefore, after as before its taking effect, engage or be interested in truck stores or shops or schemes for the furnishing of supplies, tools, clothing, provisions and groceries to their employes. And this leads to the inquiry whether the keeping of a truck store, or controlling of a store, shop or scheme for the furnishing of supplies, tools, clothing, provisions or groceries to his employes by the person carrying on the business of making excavations and embankments for roads and other improvements, erecting and repairing buildings and other structures, the business of transportation, that of the sale of goods, wares and merchandise, or that of agriculture, is, in substance and in principle, a different thing from that of the keeping of a truck store, or the controlling of a store, shop or scheme for the furnishing of supplies, tools, clothing, provisions or groceries to his employes by the person carrying on the business of mining or manufacturing. The purpose is, manifestly, the same in each case,—namely, the sale by the employer to the employe of the articles designated; and it requires precisely

12—141 ILL.

the same elements to constitute a contract, including mental capacity in the parties contracting, and freedom from fraud and overreaching, in one case as it does in the others.

The operator of a mine and the manufacturer have no other control over the employe than that which may result from employing him or continuing him in employment, or refusing to do so, and every other employer of labor has precisely the same control over those who obtain, or wish to obtain, employment with him. There can be no reason why the miner or the operative in the manufactory will be more or differently influenced by his hopes and fears in these respects than will laborers in other industries. Mining and manufacturing are indispensable branches of industry, and as honorable as any others. There is nothing in operating mines or manufactories to render the individuals employed therein less capable to contract, or to give the employer greater wisdom and adroitness therein, than if they were engaged in operating and controlling, respectively, some other branch of industry.

It may be conceded that there is more of dependence of the employe upon the employer in case of skilled labor, in a special department,—because the demand for such labor is limited in each locality by the number and size of its industries,—than there is in the case of the general laborer, who may find employment anywhere and everywhere. But mining and manufacturing do not include all the skilled labor in the country. In constructing roads, in building houses, in the business of commerce, including buying, selling and transportation, and in other branches of industry, a vast number of skilled laborers are constantly employed, and their relations to their employers would seem to be under precisely the same conditions as are those affecting the relations between operators of mines and manufactories and their employes. And, in any view, the extent and degree of dependence in particular classes of industries can not affect the general principle, since, human nature being the same in all classes of industry, the

effect of equal degrees of dependence must be the same in each class. It can not truthfully be said that all operatives in mines or manufactories are more dependent upon their employers than are all laborers in any other branch of industry. We know from observation that there are instances of entire destitution, and, consequently, of the dependence presumed to result therefrom, in all branches of industry, and that in all branches of industry there are varying degrees of destitution, and, consequently, of the correspondent presumed dependence resulting therefrom. And so it must follow, that any difference between the business prohibited by the first section when carried on by the employer of laborers in mines or manufactories, and when carried on by the employers of laborers in other branches of lawful industry, can not be one of principle, but must be purely one of degree, varying with the circumstances of particular cases, the injury from the prohibited business, if, in fact, it be such, being of precisely the same kind, whether one or many may be affected by it.

In all that relates to mining and manufacturing wherein they differ from other branches of industry, we recognize the supremacy of the General Assembly to determine whether any, and, if any, what, statutes shall be enacted for their welfare and that of operatives therein, and necessarily affecting them alone. But keeping stores and groceries, or supplies of tools, clothing and food, by whatever name, to sell to laborers in mines and manufactories, is entirely independent of mining and manufacturing, and has no tendency in any possible way to affect the mechanical process of mining and manufacturing. The prohibition of the statute operates not directly upon the business of mining and manufacturing, but upon the individual, because of his participation in that business. It is not imposed for the purpose of rendering mining and manufacturing less perilous or laborious, nor to restrict or regulate the duties of employer and employe in respects peculiar to those industries, but for the sole purpose of imposing disabili-

ties in contracting as to tools, clothing and food,—matters about which all laborers must contract, and as to which all laborers in every other branch of industry are permitted to contract with their employers, without any restriction.

Assuming, then, that the keeping of a truck store, or controlling of a store, shop or scheme for the furnishing of supplies, tools, clothing, provisions or groceries to his employes, by the person carrying on the business of mining or manufacturing, is not, in principle, a different thing from what it is when kept or controlled by persons employing laborers in different branches of labor, it is, if these sections are law, now lawful for any person or corporation, other than one engaged in mining or manufacturing, to engage or be interested directly in keeping a truck store, or controlling a store, shop or scheme for the furnishing of supplies, tools, clothing, provisions or groceries to his employes, while a person engaged in mining or manufacturing is, because of that fact, alone, prohibited from doing so. The privilege or liberty to engage in or control the business of keeping and selling clothing, provisions, groceries, tools, etc., to employes, is one of profit,—of presumptive value; and thus, by the effect of these sections, what the employers in other industries may do for their pecuniary gain, with impunity, and have the law to protect and enforce, the miner and manufacturer, under precisely the same circumstances and conditions, are prohibited from doing for their pecuniary gain. The same act, in substance and in principle, if done by the one, is lawful; but if done by the other, is not only unlawful, but a misdemeanor, punishable by fine. If the General Assembly may thus deprive some persons of substantial privileges allowed to other persons under precisely the same conditions, it is manifest that it may, upon like principle, deprive still other persons of other privileges in contracting, which, under precisely the same circumstances, are enjoyed by all but the prohibited class. And it can hardly be admissible that the legislative determination that the facts are such as to warrant

this discrimination is conclusive,—for that would make the General Assembly omnipotent,—since, if that were so, there could be nothing but its own discretion to control its action in regard to every liberty enjoyed by the citizen; and it might find that the public welfare required that society should be divided into an indefinite number of classes, each possessing or being denied privileges in contracting and acquiring property, as favoritism or caprice might dictate.

The privilege of contracting is both a liberty and a property right, and if A is denied the right to contract and acquire property in a manner which he has hitherto enjoyed under the law, and which B, C and D are still allowed by the law to enjoy, it is clear that he is deprived of both liberty and property to the extent that he is thus denied the right to contract. Our constitution guarantees that no person shall be deprived of life, liberty or property without due process of law. (Art. 2, sec. 2.) And says Cooley: "The man or the class forbidden the acquisition or enjoyment of property in the manner permitted the community at large, would be deprived of liberty in particulars of primary importance to his or their pursuit of happiness." Cooley's Const. Lim. (1st ed.) 393; *People* v. *Otis,* 90 N. Y. 48; *People* v. *Gillson,* 109 id. 398. "Due process of law" does not mean a statute passed for the purpose of working the wrong. Cooley's Const. Lim. (1st ed.) 253. These words are held to be synonymous with the words "law of the land." (Ibid. 352, 353.) "And this means general public law, binding upon all the members of the community under all circumstances, and not partial or private laws, affecting the rights of private individuals or classes of individuals." *Millett* v. *People,* 117 Ill. 294, and authorities cited.

It is not doubted that laws may be enacted, properly, and without infringing this section of the constitution, which, by reason of peculiar circumstances, may affect some persons or classes of persons only, who were not before affected by such restrictions; but in such instances the circumstances must be

so exceptional as to leave no others affected in precisely the same way upon whom a general law could have effect. As we quoted from Cooley's Constitutional Limitations in *Millett* v. *People, supra:* "Distinctions in these respects should be based upon some reason which renders them important, like the want of capacity in infants and insane persons; but if the legislature should undertake to provide that persons following some specific lawful trade or employment should not have capacity to make contracts, or to receive conveyances, or to build such houses as others were allowed to erect, or in any other way to make such use of their property as was permissible to others, it can scarcely be doubted that the act would transcend the due bound of legislative power, even if it did not come in conflict with express constitutional provisions. The man or the class forbidden the acquisition or enjoyment of property in the manner permitted to the community at large, would be deprived of *liberty* in particulars of primary importance to his or their pursuit of happiness." Cooley's Const. Lim. (1st ed.) 391. And upon this principle we held in *Millett* v. *People, supra,* that it is not competent, under the constitution, for the General Assembly to single out owners and operators of coal mines, and provide that they shall bear burdens not imposed on other owners of property or employers of labor, and prohibit them from making contracts which it is competent for other owners of property or employers of labor to make.

In *State* v. *Goodwillie,* 33 W. Va. 179, and in *State* v. *F. and C. Coal Co.* id. 188, the question before the Supreme Court was, whether a statute of West Virginia declaring "that it shall not be lawful for any person, firm, company, corporation or association engaged in mining coal, ore or other minerals, or mining or manufacturing them, or either of them, or manufacturing iron and steel, or both, or any other kind of manufacturing, * * * to issue for the payment of labor any order or other paper whatsoever, unless the same

purports to be redeemable for its face value in lawful money of the United States, bearing interest at a legal rate, made payable to employe or bearer, and redeemable within a period of thirty days by the person, firm, company, corporation or association giving, making or issuing the same." The court held, after a lengthy and able discussion of the question, that the enactment was unconstitutional and void. The court, among other things, said: "The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder him from employing these in what manner he may think proper, without injury to his neighbor, is a plain violation of this most sacred property. It is equally an encroachment both upon the just liberty and rights of the workman and his employer, or those who might be disposed to employ him, for the legislature to interfere with the freedom of contract between them, as such interference hinders the one from working at what he thinks proper, and at the same time prevents the other from employing whom he chooses. A person living under the protection of this government has the right to adopt and follow any lawful industrial pursuit, not injurious to the community, which he may see fit; and as incident to this is the right to labor or employ labor, make contracts in respect thereto upon such terms as may be agreed upon by the parties, to enforce all lawful contracts, to sue, and give evidence, and to inherit, purchase, lease, sell and convey property of every kind. The enjoyment or deprivation of these rights and privileges constitutes the essential distinction between freedom and slavery, between liberty and oppression." There was like ruling in regard to a similar enactment by the Supreme Court of Pennsylvania in *Godcharles* v. *Wigeman,* 113 Pa. St. 431.

In *Commonwealth* v. *Perry,* 139 Mass. 198, the defendant was indicted under a statute of Massachusetts providing that

"no employer shall impose a fine upon or withhold wages, or any part of the wages, of an employe at weaving, for imperfections that may arise during the process of weaving," and the court held the statute unconstitutional, and in doing so said : "There are certain fundamental rights of every citizen which are recognized in the organic law of all our free American States. A statute which violates any of these rights is unconstitutional and void, even though the enactment of it. is not expressly forbidden.   *   *   *   The right to acquire, possess and protect property includes the right to make reasonable contracts which shall be under the protection of the law. The manufacture of cloth is an important industry, essential to the welfare of the community. There is no reason—indeed, the statute before us recognizes it—why men should not be permitted to engage in it as a legitimate business, into which anybody may freely enter. The right to employ weavers, and to make proper contracts with them, is therefore protected by our constitution, and a statute which forbids the making of such contracts, or attempts to nullify them or impair the obligation of them, violates fundamental principles of right which are expressly recognized by our constitution." See, also, to like effect, *People* v. *Max*, 99 N. Y. 377 ; *Matter of Jacobs*, 98 id. 98 ; *Ex parte Kubach*, 85 Cal. 274.

But it is contended the enactment before us is sustained by the principles announced in *Munn et al.* v. *People*, 69 Ill. 180. There is, in our opinion, no analogy between that case and the present. In the first place, there the subject matter of the act was local and exceptional in its nature, and the law in question operated alike upon all affected by like conditions. In the second place, the business of warehousing was held to be affected by a public use, and assimilated to the business of carriers, inn-keepers, millers and others of like kind, and therefore subject to regulations for the public welfare. And, in the third place, the statute there affected only the business of warehousing—that wherein the necessity of

transportation from the west to the east left the shipper no discretion, but compelled him, whether he would or no, to patronize the warehouse. It did not assume to regulate or restrict the warehouseman in contracting with his laborers, or his laborers in contracting with him. See *Munn* v. *Illinois,* 94 U. S. 127.

Other instances of statutory regulations of private rights are, in lien laws in favor of homesteaders, mechanics, etc.; limitation laws; the Statute of Frauds, and other statutes relating to evidence; laws in regard to pleadings; exemption laws and insolvent laws. But these all relate, not to the power to contract in regard to matters of general right, but to the remedy for the enforcing of contracts, as to which the legislature may make such regulations as the public welfare seems to demand, so long as, under pretense of regulating the remedy, it does not impair the right itself. Cooley's Const. Lim. (1st ed.) 361. So, under what is denominated the "police power," laws may be constitutionally enacted imposing new burdens on persons and property, and restricting personal rights of enjoyment of property, where, in the opinion of the General Assembly, the public welfare demands it,—— under which may be instanced license laws, laws or ordinances fixing fire limits, quarantine laws, laws imposing liability upon masters on account of death or injury of servants, laws requiring dangerous machinery to be so guarded and used as to avoid injuries to others, laws to prevent monopolies, extortions and fraudulent impositions, and, in general, all laws whereby one person is prohibited from so using his liberty or property as to injure or endanger the liberty or property of another. Cooley's Const. Lim. (1st ed.) 527. Under this head may also properly be classed usury laws, and laws that may have been found on the statute books of England, and also perhaps on statute books of some of the States, imposing peculiar and exceptional restrictions on contracts with seamen. Usury laws proceed upon the theory that the lender and the

the borrower of money do not occupy towards each other the
same relations of equality that parties do in contracting with
each other in regard to the loan or sale of other kinds of prop-
erty, and that the borrower's necessities deprive him of free-
dom in contracting, and place him at the mercy of the lender.
And such laws may be found on the statute books of all the
civilized nations of the world, both ancient and modern. See
Tyler on Usury, 61; *Dunlap* v. *Gould,* 16 Johns. 377.

By the common law the master had authority over all the
mariners on board the ship, and in case of disobedience, disre-
spectful or disorderly conduct, he might lawfully correct them
in a reasonable manner, "his authority in this respect being
analogous to that of a parent over his child, or of a master
over his apprentice or scholar." Abbott on Shipping, (7th
Am. ed.) p. 248, sec. 4, and note. By the very nature and
necessities of their employment, and the usages and customs
governing it, seamen thus constituted a servile class, as dis-
tinctly marked, and as dependent and helpless, in many re-
spects, as that of infants, and, of necessity, they required a
measure of protection not required by the citizen who ac-
knowledges no master. When, however, it is reflected that in
this State all who have not been convicted of crime are, theo-
retically, equals before the law, it must be manifest that this
principle of the common law could never have been enforced
here.

In none of the statutes alluded to is one person denied a
privilege or liberty which is allowed to others under like con-
ditions or circumstances, as he is here. The police power is
limited to enactments having reference to the comfort, the
safety or the welfare of society, and under guise of it a person
can not be deprived of a constitutional right. It is impossible
that, under that power, what is lawful if done by A, if done
by B can be a misdemeanor, the circumstances and conditions
being the same. Theoretically there is among our citizens
no inferior class, other than that of those degraded by crime

or other vicious indulgences of the passions. Those who are entitled to exercise the elective franchise are deemed equals before the law, and it is not admissible to arbitrarily brand, by statute, one class of them, without reference to and wholly irrespective of their actual good or bad behavior, as too unscrupulous, and the other class as too imbecile or timid and weak, to exercise that freedom in contracting which is allowed to all others.

So far as *Hancock* v. *Yoden*, 121 Ind. 365, may be in conflict with the views we have herein expressed, it is equally in conflict with *Millett* v. *People, supra.*

There is nothing in the recent decision of the Supreme Court of West Virginia, in *State* v. *Peel Splint Coal Co.* in conflict with our decision in this case.

It proves nothing that statutes may have been in force in England analogous to the sections involved in this suit, for there, as Blackstone says, "parliament is absolute and without control,"—1 Commentaries, (Cooley's ed.) p. 161, *162,—while our legislative powers are restricted by a written constitution.

We feel compelled to hold that the sections we have considered are repugnant to section 2 of article 2 of our constitution, and therefore not law.

The proposition in writing submitted to the court included sections not pertinent to this case, and it was therefore too broad, and the court properly refused to mark it as "held." But the court erred in finding appellants guilty and in giving judgment on behalf of appellee, and that judgment is reversed.

A petition for rehearing has been presented since the filing of the foregoing opinion, and we have given its arguments all the care and consideration within our power, and having done so we still remain of the opinion before announced. We have no discretion. Understanding our constitution as we do, it is impossible, without disregarding its provisions, to sustain a statute which makes that a misdemeanor when done by per-

sons while engaged in one branch of industry, which, if done by persons in another branch of industry, in like relations and under like conditions, will be lawful. We doubt not that grievous wrongs have resulted from overreaching by employers of employes engaged in mining and manufacturing; but if so, on like principle, precisely the same wrongs are liable to result in other branches of industry under like conditions, and the wrong, wherever done, must, in principle, always be the same. It is the province of legislation to deal with general principles, leaving their application to particular facts to the courts. See Const. art. 3.

We have, since considering this petition, restated, in somewhat different language, our views upon the question involved in this case, and the present opinion will therefore be filed and published in lieu of that heretofore filed.

The rehearing is denied.

*Rehearing denied.*