## DAVIS LOAN CO. v. BLANCHARD

———

(July 1, 1930. Opinion and Decree.)
(October 20, 1930. Rehearing Refused.)

———

Gill & Simon, of New Orleans, attorneys for plaintiff, appellant.

Marcus & Corkern and D. C. Corkern, of New Orleans, attorneys for defendant, appellee.

WESTERFIELD, J. This is a suit by a licensed money lender against a borrower on a promissory note in the sum of $20. The defense is that the loan is unenforceable because usurious in that defendant was required to pay a notarial fee of $3.50 for the execution of a chattel mortgage securing the loan and for the further reason that the note provides for attorney's fees at 20 per cent, with a minimum of $10. There was judgment below in favor of defendant as prayed for and plaintiff has appealed.

The agreed statement of facts is as follows:

"That the Davis Loan Company is a licensee under the Small Loan Law (Act No. 7. of Special Session of 1928).

"That on July 29, 1929, this company granted a loan to W. Blanchard, who executed his certain promissory note therefor in the sum of Twenty ($20.00) Dollars, payable on August 29, 1929, with interest at the rate of 3½% per month from July 29, 1929, until paid, together with attorneys fees at the rate of 20% on the aggregate amount of principal and interest, providing that the minimum attorneys fees shall be $10.00.

"That the Davis Loan Company required W. Blanchard to execute in its favor a chattel mortgage on certain property described therein, which chattel mortgage was executed before Warren M. Simon, attorney and notary for the Davis Loan Company. That said chattel mortgage has not been recorded in the Mortgage Office for the Parish of Orleans. That the wife of W. Blanchard did not appear in said act. That no representative of the Davis Loan Company inspected or appraised the property described in said chattel mortgage prior to the time that said loan was consummated, but obtained a description and valuation of said property from W. Blanchard with which it was satisfied. That in these proceedings plaintiff has not asked for the recognition or maintenance of its chattel mortgage, or made any mention thereof.

"That the act of chattel mortgage and loan was executed in the office of Warren M. Simon, Notary, in the presence of W. Blanchard, and Mr. L. M. Magruder, Manager of the Davis Loan Company, and two competent witnesses; that the said Warren M. Simon, Notary, charged W. Blanchard a notarial fee of $3.50 for executing said act of chattel mortgage.

"That the Davis Loan Company paid out the sum of $20.00 to W. Blanchard, who simultaneously paid $3.50 to Warren M. Simon to cover his notarial charge as aforesaid.

"That W. Blanchard has not paid any part of said note.

"It is further agreed in connection with the question of notarial charges being paid by borrower under Act 7 of the Special Session of 1928, the attitude of the State Banking Department, which supervises all loan companies in this State, has been that while it was of the opinion that the charge was a violation of the provisions of the act, it would raise no objection to the charge being paid by the borrower unless some borrower should lodge a complaint with the department, in which event it would contest the validity of said charge, and it has not heretofore revoked the license of any licensee or prosecuted any licensee criminally, on account of the borrower being charged and paying a notarial fee to any Notary.

"Pending a determination of the effect of notarial charges being paid by the borrower, the plaintiff has not required its

borrowers to pay notarial charges for chattel mortgages furnished in connection with their loans."

Act No. 7 of the Special Session of 1928, known as the Small Loan Act, has for its object the licensing and regulation of the business of making loans in sums of $300 or less, secured or unsecured, at a greater rate of interest than 8 per cent per annum, the maximum conventional rate prior to the adoption of this legislation. Section 13 of the act reads as follows:

"Every person, co-partnership and corporation licensed hereunder may loan any sum of money not exceeding in amount the sum of Three Hundred Dollars ($300), and may charge, contract for and receive thereon interest at a rate not to exceed three and one-half (3½) per centum per month. Interest shall not be payable in advance or compounded and shall be computed on unpaid balances. In addition to the interest herein provided for, no further charge or amount whatsoever for any discount, examination, service, brokerage, commission or other thing or otherwise shall be directly or indirectly charged, contracted for or received, except the lawful fees, if any, actually and necessarily paid out by the licensee to any public officer for the filing or recording or releasing any public office any instrument securing the loan, which fees may be collected when the loan is made or at any time thereafter. Interest, discount or charges in excess of those permitted by this Act shall not be charged, contracted for or received, and if any such shall be charged, contracted for or received, the contract of loan shall be void and the licensee shall have no right to collect or receive any principal, interest or charges whatsoever."

It will be observed that, in addition to the interest, no charge is to be made the borrower "except the lawful fees, if any, actually and necessarily paid out by the licensee to any public officer for the filing or recording * * in any public office any instrument securing the loan." It is the contention of plaintiff that this language has no reference to notarial charges received by a notary, who is not the lender, or licensee, because "the notarial charge being fixed, made and received by the notary and which is a matter between the notary and borrower and with which the lender has absolutely no connection and receives no remuneration, it cannot possibly be said that such a charge is prohibited by section 13 of the act." It is further contended that it has long been customary in this state for the mortgagor to bear all expenses incident to the execution of the mortgage, such as notarial fees. This is true, it is said, of every loan made by an automobile finance company operating in this state, which requires the borrower to pay the cost of a chattel mortgage upon his automobile securing the loan, as well as all other expenses incidental to the consummation of the loan. It is also true, the argument proceeds, of the homesteads and banks, when lending money upon real estate, and of furniture houses and other merchants selling goods, where a mortgage is taken upon the merchandise sold, and that a custom so universal, in the absence of positive law to the contrary, has acquired the force of tacit and common consent. "Customs result from a long series of actions constantly repeated, which have, by such repetition and by uninterrupted acquiescence, acquired the force of a tacit and common consent." R. C. C. art. 3. A customary charge by a third person for the usual security is, it is claimed, unobjectionable from any standpoint. (Parenthetically, it will be noted that the chattel mortgage in this case afforded plaintiff no security whatever. It was invalidly executed, because not signed by defendant's wife, in the teeth of the requirement of section 17 of the act, and, moreover, was not recorded. It would therefore be ineffective as against third persons, even if

validly drawn. Why plaintiff should exact a chattel mortgage and deliberately fail to record it is not easily understood, and certainly inconsistent with any idea of securing his loan by this means.)

But to return to the question of custom and conceding it to be as counsel contends with respect to the notarial charges, would the mere fact of their customary exaction in some transactions justify the practice in this instance; and if notarial fees may be exacted here, then why not a fee for experts customarily employed to value property, and why not a commission to a broker, the customary commission, if you please?

Chancellor Kent, in a very interesting case decided in 1819 (Dunham v. Gould, 16 Johns. 367, 8 Am. Dec. 323), in speaking of the force of custom (a commission of 2½ per cent to a broker) as overriding the maximum exactions permitted under usury laws of the state of New York, said:

"The custom of merchants is not applicable to such a case. It is not a matter of trade and commerce within the meaning of the law merchant. And if there were such a local usage in New York, it would be null and void, and could not be set up as a cover or pretext to trample down the law of the land. The money-lenders throughout the country might as well set up a practice of their own, and then plead it in bar of the statute."

But the Act of 1928 plainly indicates that notarial fees are not to be permitted because, under section 13, filing fees are the only exceptions to the prohibition of the act against "further charge or amount whatsoever for any discount, examination, service, brokerage, commission, or other thing or otherwise * * * directly or indirectly charged." If there had been any intention to permit the exaction of a notarial fee, the act would have so provided, because the custom of public officers requiring a recording or filing fee is quite as well established as the custom of charging notarial fees for the preparation of chattel mortgages. The fact that the payment in this instance was made to plaintiff's notary by the borrower, who retained the sum paid without division or accounting to his client, does not alter the situation, for, if a notarial fee may be charged at all, there is nothing to prevent a notary from becoming a licensed money-lender under the act and charging and receiving as notarial fees a sum equal to or greater than the maximum interest charge permitted under the act in his capacity as notary public. It will be observed that in this case the borrower obtained $20 from the lender, on which he contracted to pay 3½ per cent per month, and simultaneously paid to the lender's notary $3.50, a sum equal to 17½ per cent. The borrower is, therefore, actually required to pay 17½ per cent as a notarial fee and 3½ per cent, the maximum permitted under the small loan law. But the 3½ per cent is based upon $20, whereas the real sum received by the borrower was $16.50. Consequently, the rate of interest, instead of being 3½ per cent, is 4.2 per cent. The total charge which the borrower is required to pay in this instance would, therefore, be 21.7 per cent per month, or 260.4 per cent per year. In addition, the note stipulates for attorney's fees of 20 per cent, with a minimum of $10, and, incidentally, it does not appear that the attorney's fee is contingent upon default in payment. Assuming, however, that that is the case, the total cost to this defendant for the use of $20 for thirty days, the term of his note, would be 17½ per cent in the form of notarial fees, 4.2 per cent for interest and 50 per cent for attorney's fees, a total of 71.7 per cent per month, or

860.4 per cent per annum. If the transaction terminated at the end of the first thirty days and the note be paid promptly the attorney's fees might, perhaps, be avoided, but if the borrower elects, or is compelled, because of necessity, to renew the loan, and the same exaction is made, he will be charged another 71.7 per cent for another thirty days, and so on. The fact that the money-lender does not get all of the charge is entirely immaterial, because the purpose of the act is not to limit the profits of the money-lender, but to relieve the burden of the indigent borrower.

In the leading case of Frorer v. People, 141 Ill. 171, 31 N. E. 395, 399, 16 L. R. A. 492, the court, in speaking of the purpose of usury laws, said:

"Usury laws proceed upon the theory that the lender and the borrower of money do not occupy towards each other the same relations of equality that parties do in contracting with each other in regard to the loan or sale of other kinds of property, and that the borrower's necessities deprive him of freedom in contracting and place him at the mercy of the lender."

It is interesting to reflect that the loan of money, except as a gratuitous accommodation, was from the beginning regarded as disreputable. Anciently, interest and usury were synonymous. A worthy citizen of Zion is described by David as, "One that putteth not out his money to usury." Moses condemned the practice between brothers, but, with a singular conception of hospitality, permitted a stranger to be victimized: "Thou shalt not lend money upon usury to thy brother; usury of money, usury of victuals, usury of any thing that is lent upon usury. Unto a stranger thou mayest lend upon usury, but unto thy brother thou shalt not lend upon usury." Deuteronomy XXIII, 19, 20. When Christ came to Jerusalem upon the occasion of the Passover,

"And found in the temple those that sold oxen and sheep and doves, and the changers of money sitting:
"And when he had made a scourge of small cords he drove them all out of the temple, and the sheep, and the oxen; and poured out the changers money, and overthrew the tables." John, II, 13-14-15.

All the dealers were driven out of the temple with a scourge, but the money-changers had their money poured out, and their tables upset.

The way of the money-lender in Biblical times was hard, but we look in vain for any contemporaneous denunciation of such practices as that of Jacob defrauding his brother Esau of his birthright by taking advantage of his uncontrollable appetite for lentil soup. Nor do we find any criticism of the greedy rapacity of Laban, who seized upon the grand passion of Jacob for his daughter Rachel to bargain for seven years at hard labor as the price of her hand in marriage, and who, when Jacob had faithfully discharged his part of the agreement, which to his everlasting credit and the greater glory of Rachel, he remarked seemed but a few days, demanded and obtained seven more years of labor before he would consent to the wedding.

"The teachings of the Hebrew Scriptures had a powerful influence upon the opinions of the leaders in the early Christian Church. Following out the Biblical prohibitions of interest, the great fathers of the Church, such as Chrysostom, Tertullian, and others, were all opposed to interest of any kind. This unanimity of opinion on the subject resulted in numberless edicts and decrees by popes, councils, kings, and legislatures over a period of more than fifteen hundred years. The prohibition of usury became, in fact, the center of the canonist doctrines."

Ryan on Usury and Usury Laws, p. 42.

These early conceptions of interest as pernicious have, of course, yielded to a more rational view of the subject, but in practically every state of this Union, as we believe, a statutory maximum exists, the permissive amount varying from 6 to 30 per cent. In Louisiana, as is well known, the rate prior to the enactment of the small loan law, was 8 per cent. Perhaps the realization that this maximum was not effective as against small loans inspired its enactment, a somewhat similar situation to that which preceded the adoption in 1545 of a statute of Henry VIII, legalizing interest, for in that act it is declared, "the statutes prohibiting interest altogether had so little force that little or no punishment ensued to the offenders." Ryan on Usury and Usury Laws, page 45. An increase in the permissive rate of interest from 8 per cent to 42 per cent must have been due to a change in the public policy of the state. It is a matter of common knowledge that the maximum statutory permissive rate was not observed insofar as small loans to persons of limited means and income were concerned. Such persons, when required to borrow for some emergency and under the handicap of great necessity, were in no position to bargain over rates of interest. The parties who engaged in the business of lending these individuals at usurious rates were called "loan sharks" and other names of an uncomplimentary character. In justice to such individuals, however, it must be said that the risks which they were required to take would not justify their lending money at 8 per cent interest. It was the eventual recognition of this fact which led to an effort to legalize such loans by permitting a rate of interest commensurate with the risk involved, with some allowance for the fact that the business itself, even under the best conditions, was socially regarded as an undesirable occupation. In establish-

ing the maximum of 3½ per cent per month, or more than five times the former rate, the purpose of the legislature was to fix a maximum charge for the borrowing of small sums of money. As a matter of fact, the charge can hardly be said to be interest in a proper sense, because it is for the most part an allowance for overhead expense on account of the unusual heavy losses incident to that character of money lending. Transactions under the small loan law cannot be compared with loans for industrial purposes, business expansion, or productive loans. These small loans are consumptive loans and for that very reason the borrowers often find themselves unable to repay their loans, since, as is largely the case, their incomes and necessities have remained constant and with no reserve to take care of the additional expense of the loan. The purpose of this legislation, therefore, was to fix a maximum charge for money to the small borrower. In that view of the case, whether the charge be direct or indirect, whether part of the exaction be payable to the lender or to a third person by requirement of the lender, is immaterial, if the expense to the borrower exceeds the maximum amount as established by the statute.

For the reasons assigned the judgment appealed from is affirmed.

JANVIER, J., dissents.

ON APPLICATION FOR REHEARING

The majority of the court believe that the author of this opinion possibly went further than the necessities of the situation required in disposing of the issues presented. All of the members of the court, however, believe the decree to be correct. Consequently the rehearing will be refused.