336

Cleaning and Dyeing Plant Owners Association of Chicago, et al., Appellees, v. Sterling Cleaners and Dyers, Inc., et al., Appellants.

Gen. No. 38,486.

Opinion filed May 13, 1936.   Rehearing denied May 28, 1936.

IRVING BREAKSTONE, MARTIN J. McNALLY and PINES, STEIN & BEBER, all of Chicago, for appellants; ALVIN E. STEIN, ALFRED BROADY and WILLIAM ROSENTHAL, all of Chicago, of counsel.

LAVIN & JAFFE, of Chicago, for appellees; MAURICE WALK, WILLIAM JAFFE, GEORGE S. LAVIN and IRA S. KOLB, all of Chicago, of counsel.

MR. JUSTICE HEBEL delivered the opinion of the court.

This is an appeal by Sterling Cleaners & Dyers, Inc., Peacock Cleaners & Dyers, Ltd., Michigan Cleaners & Dyers, Inc., and Checker Cleaners & Dyers, Inc., defendants, and a separate appeal by co-parties, Abar-

banell Bros., Inc., and Berwyn Dry Cleaning Co., defendants, from the final decree entered by the circuit court of Cook county on July 13, 1935, confirming and approving the master's report and overruling the exceptions of the defendants thereto and permanently enjoining and restraining these defendants from:

"(a) Selling, offering for sale, rendering or offering to render at retail, cleaning and pressing services below cost. Selling, offering for sale, rendering or offering to render at retail, cleaning and pressing services, for men's and women's garments at a price less than seventy-five (75¢) cents per garment, for cash and carry, and less than ninety (90¢) cents per garment, called for and delivered.

"Selling, offering for sale, rendering or offering to render at wholesale, cleaning services for men's suits, unfinished, or as is commonly referred to in the trade as 'x' work, at less than fifty (50%) per cent of the cash and carry price as set forth herein.

"Selling, offering for sale, rendering or offering to render at wholesale, cleaning and pressing, or as is commonly referred to in the trade as finished work, ladies' dresses at less than sixty (60%) per cent, of the retail cash and carry price as set forth herein.

"(b) Advertising in any publication, newspaper, periodical, by signs, on wagons, signs on windows, signs on trucks, through the radio, verbal solicitations, through the use of circulars, handbills, billboards, or from making known in any other manner that the cleaning and pressing services as above set forth in paragraph (a) will be rendered at prices below those designated in said paragraph (a) hereof.

"(c) Advertising in any form designated in paragraph (b) hereof in manner or statement which inaccurately describes the character of service rendered, the grade, quality of the service which is rendered, or from advertising in any manner which might tend to deceive or mislead customers or the public.

"(d) Advertising in any manner designated in paragraph (b) hereof values of services which might tend to deceive or mislead any customer, and from advertising in any particular in any such manner as would unfairly represent the actual price charged for services rendered, and from making any statements in such advertisements that the prices charged are less than those charged by any other competitors.

"(g) Engaging in the conspiracy or combination in the cleaning business for the purpose or with the effect of destroying, injuring, or damaging the plaintiffs, or any or either of them by the doing of the acts herein restrained.

"(h) Singly, or collectively engaging in unfair competition or unfair trade practices in the cleaning and dying industry in Cook County, as set forth in paragraphs (2), (a), (b), (c), (d) and (g) hereof.

"(3) This court hereby specifically retains jurisdiction of the parties hereto and the subject matter hereof for the purpose of modifying or enlarging said decree, or entering another decree in furtherance of the purposes of carrying into complete effect the provisions hereof, so that complete justice may be done between all the parties necessary to carry this decree into practical effect, in the event of a change in economic conditions."

From the record and the statement of facts in the briefs it appears that one of the plaintiffs herein, Cleaning & Dyeing Plant Owners Association, of Chicago, a corporation not for profit, was organized in October, 1933, to succeed the Chicago Master Cleaners & Dyers Association. This latter association in 1930 and 1931 consisted of about 121 plant owners in the cleaning and dyeing business, who signed a contract with one Dr. B. M. Squires, whereby he was employed as general sales manager to stabilize the cleaning and dyeing industry.

These plant owners agreed to pay Squires 2 per cent of all their gross proceeds for his services. Squires was permitted under the contract to fix the minimum price at which the members were to sell dry cleaning to the public. In 1930 he recommended a minimum price of $1. In March 1931 he fixed the price at $1.25. Most of the plants under the contract charged that price.

From time to time violations were reported to him of plants under the contract selling services for less than the recommended price and Squires, according to his testimony, "would then undertake methods of a persuasive character looking towards getting them to abide by the recommended price."

It also appears from the evidence that James P. Gorman one of the plaintiffs' witnesses and who was president of the Retail Cleaners & Dyers Union was employed by the Association as labor commissioner. Squires testified that as labor commissioner Gorman's duties were "to go about the industry with such assistants as he might require to see that the various plant owners were complying with the wages and conditions I had set as impartial chairman and secondly to report to me any violations of the minimum prices I had recommended." He was paid a salary of $200 per week and expenses. From June 1931, to April or May, 1932, Squires paid Gorman $6,000 in salary and $21,000 for expenses.

It also appears that this association financed a strike, which was called in 1931 against the Michigan Cleaners, one of the defendants herein. The Association turned over to the union for that purpose four or five thousand dollars.

It also appears that $30,000 of the Association money was turned over to Frank Harscher, secretary of the Association, for expenses in maintaining an office where complaints were "heard and investigated."

$40,000 was spent in advertising and money was turned over to the unions to finance pickets for strikes against plants that failed to observe the prices fixed by Squires from time to time as needed, for which no accounting was demanded or given.

It also appears from the evidence that George E. Peterson & Co. as oil jobbers supplied 80 per cent of the cleaners with naphtha when the Squires Institute was formed; that during this period the Peterson Company regularly gave the Institute and the Master Cleaners & Dyers a monthly rebate of $800 for a monopoly on the membership patronage.

In 1931 at the suggestion of Squires the name of the Chicago Master Cleaners & Dyers Association was dropped and they called themselves the Cleaners & Dyers Institute of Chicago, with Squires as Chairman. The contract expired with Squires in October, 1933, when the Cleaning & Dyeing Plant Owners Association of Chicago was formed to succeed the former company.

The constitution and by-laws of the plaintiff association are attached to the complaint herein and were offered in evidence and provide among other things that any person, firm or corporation in the business of cleaning and dyeing in Chicago, or operating such business in Chicago shall be eligible for membership. All members thereof agree not to sell any cleaning and dyeing service in or for delivery to or for resale in any part of the trading area of Chicago at a price lower than set by the board of directors as a fair and equitable price, and further provides that all policies, rules, regulations, orders and decisions adopted shall be obligatory and binding upon all members and be complied with, and any member violating such by-laws, rules, regulations, orders and decisions shall be subject to suspension and entitle the Association to a restraining order or injunction against such violating member without bond or notice.

Frank Harscher, the secretary of the plaintiff association, testified that the directors of the Association had fixed a price for the members at 69 cents and 85 cents, and the wholesale service to tailors at 40 cents for a finished dress or plain suit, and for rough work without finishing the price of 25 cents. This was the price in force at the time he testified. 69 cents was the only price recognized by the Association.

The Association had committee meetings from time to time attempting to regulate the wholesale prices of cleaning and dyeing for any retail outlet or tailor groups. The 40-cent finishing price is fairly uniform with 90 per cent of the membership of the Association.

Salzman, a witness on behalf of the plaintiffs, testified, "The members of our Association agreed among themselves to maintain a fixed uniform price throughout the membership Association. We attempted to get people outside the Association to charge the same minimum price."

The plaintiff association practically controls the entire industry, as out of 104 or 105 power plants engaged in the cleaning and dyeing business, 97 are members of the plaintiff association. The Association made a contract with the Cleaning & Dyeing & Pressers Union which was made binding upon all its members. Although members of the plaintiff association failed to comply with the union contract from time to time, no strikes were called against members excepting one.

The defendants Abarbanell Bros. and Michigan Cleaners are two of the oldest dry cleaning establishments in the Chicago area. Abarbanell Bros. was founded in 1900 and the business was operated continuously from that time until the present. It was first located in Chicago and later, in 1908, moved to LaGrange where its plant is still located. All of its machinery is of the latest type construction and practically new, none of it being older than three years.

It has 29 chain stores or outlets, representing an investment of $2,000 to $5,000 per store.

The defendant, Michigan Cleaners & Dyers, was started in 1900 in Chicago with one store and grew in proportion. In 1925 it had outgrown its plant and a new one was built at a cost of about $125,000 and machinery and equipment of about $25,000 to $30,000. It is a wholesale and retail plant.

In 1929 the union took away its drivers and considerable of its business and the Checker Cleaners were thereupon organized. They operated about 32 chain stores themselves and about 19 stores through others. The work was done for the Checker Cleaners by the Michigan Cleaners.

The business of the Peacock Cleaners began originally in 1922, but did not do its own cleaning until 1929, when a plant was built. At first it did some wholesale business through the help of one of the unions, but these shops were later taken away from it by the union and it began to open up retail or chain stores. In 1930 it had 12 stores in operation, and today it has 32 stores. One of the plaintiffs, Paramount Cleaners, did all the dry cleaning for Sterling at a cost below that charged by Sterling to the public.

One of the labor unions had a number of people organized secretly in the plants of the defendants who were not members of the Association, such as Abarbanell Bros., Inc., Michigan Cleaners, Peacock Cleaners, and others, for the purpose of "pulling a strike" against them. The union did not approach or ask Abarbanell Bros., Inc., or the others to join the union or attempt to bargain with them collectively on behalf of the employees. A strike was called on the plants of the defendants and the other plants without any notice in advance.

The defendants, Michigan Cleaners & Dyers and Checker Cleaners & Dyers, during 1931, 1932 and 1933,

had various strikes called at their plants, and numerous fires were set at many of their stores. They had repeated bombings, shootings, breaking of windows at numerous stores, threats and intimidation, and acid was spilled on over $40,000 of garments, all resulting in serious damages and loss to them.

According to the testimony of three witnesses, the Checker Cleaners opened a store at one time near the shop of Lefkovitz, a member of the Institute, and advertised cleaning at a price of 79 cents for two garments, while the Institute required its members to charge $1.25 per garment. A meeting was called at which Gorman, the so-called labor commissioner of the Institute, was present. The members who complained of this alleged unfair competition of the Checker asked Gorman if they could cut their price to two garments for $1; Gorman said, "nothing doing" and if they gave him two weeks he would take care of the Checkers. At another meeting of the Master Cleaners & Dyers Association when complaint was again made, Walter Crowley, the president of the Association, requested that they give him two weeks and he would take care of the Checker. Thereupon one Abe Tangle, a member of the Association, got up and said that he was "tired of that stuff" about waiting two weeks; thereafter the Checker shop in question had an explosion, the windows were smashed and the counter splintered.

On May 29, 1931, upon the application of Michigan Cleaners and Checker Cleaners, a decree of injunction was procured from the superior court of Cook county restraining the various unions from interfering with or molesting them.

During the early part of 1932, Peacock Cleaners, operating as an open shop was picketed by the unions. On May 24, 1932, one of their drivers was waylaid by the pickets and injured. They had, during this period of the so-called strike, a series of spite fires at the

plant, which damaged a great many garments. As soon as they signed the contracts with the unions on June 1, 1932, the fires stopped and they had no further trouble, until sometime in the early part of 1933, when they received two registered letters from the two unions with which they had contracted, to the effect that as their contracts with the respective unions expired, 20 per cent additional would have to be added to the salaries of their employees unless they joined the Chicago Cleaners & Dyers Association. They did not join, and next received a ''pineapple'' which blew up their plant on April 17, 1933, causing about $5,000 damages.

In 1931 Abarbanell Bros., although not a union shop, had a strike called by the unions and without notice found their plant picketed one morning and their employees and customers prevented from entering the plant. Various acts of violence were committed. On November 2, 1931, a temporary injunction was entered in the circuit court against the unions to restrain them, among other things, from interfering with the business of Abarbanell Bros. In 1933 and 1934 bullets were fired in various of their windows, a suitcase with 24 sticks of dynamite was found in the boiler room of their plant, but failed to explode. Several days later two stores were bombed. There is evidence that one of the plaintiffs hired, established, paid for and maintained a picket line against Abarbanell Bros., Inc., stores for the purpose of injuring its business.

It further appears from the evidence that a similar suit was filed in March, 1934, against the defendants herein, Sterling Cleaners & Dyers, Inc., Abarbanell Bros., Peacock Cleaners & Dyers, Ltd., Michigan Cleaners & Dyers, Inc., and several others, by one Theodore M. Becker and 55 others, most of whom were also members of the plaintiff's association, in the cir-

cuit court of Cook county. This suit was, however, later dismissed.

In 1934, the plaintiffs shut down their respective plants. The labor unions immediately declared strikes against non-members of the Association, including Abarbanell Bros., Peacock Cleaners, Michigan Cleaners and Checker Cleaners, and within 72 hours after the lockout by the plaintiff association not a single plant was operating in the entire City of Chicago. The respective plants of the defendants were surrounded by three to five hundred pickets and the employees prevented from working. The unions, however, were still friendly with the Association, and while the defendants' plants were picketed, no pickets operated in front of the tailors or any stores which were operated by members of the plaintiff association.

A union official called various meetings for the purpose of arriving at a common price between the defendants Peacock Cleaners & Dyers, Inc., Michigan Cleaners, Abarbanell Bros. and Sterling Cleaners and the members of the plaintiff association, but no settlement was effected. Later, in September, 1934, Abarbanell Bros., Peacock Cleaners & Dyers, Ltd., Michigan Cleaners & Dyers, Inc., and Checker Cleaners & Dyers, Inc., in order to be permitted to carry on their respective businesses, were forced to sign contracts with the labor unions and the strike was then discontinued. Thereupon the members of the plaintiff association, having accomplished their purpose by forcing defendants to unionize their shops, discontinued the lockout and proceeded with their business.

The defendants have since then operated and are now operating their respective plants as union shops and are paying union wages.

Immediately thereafter, the complaint herein was filed by the plaintiff association in the circuit court of Cook county and on October 11, 1934, a temporary in-

junction was procured on the basis of the complaint, which was subsequently reversed by this court for the reasons stated in the opinion in the case entitled *Cleaning & Dyeing Plant Owners Ass'n of Chicago et al., Appellees v. Sterling Cleaners & Dyers, Inc. et al., Appellants,* 278 Ill. App. 70.

On January 22, 1935, another strike was called against Abarbanell Bros., by the two labor unions. From the evidence it appears that this concern had complied with all the terms of the union contract and was paying union wages and observing union hours.

The officials of both unions advised Abarbanell Bros., that "if you want your plant to open you will have to go up to 69 cents." Abarbanell Bros. advised them that they would be willing to raise the wages of their employees 25 per cent over the union scale, if they were permitted to operate at any price they desired. This the unions refused to accept. Abarbanell finally offered to abide by the price, if they would not be compelled to display the 69-cent sign in the windows. Albert, the president of the Cleaners & Pressers Union, claimed that Abarbanells told him that they would pay 10 per cent over the union scale for dry cleaning if they did not have to keep the 69-cent signs in their windows. In order to avoid further labor troubles and losses thereby Abarbanells agreed to increase their prices to 69 cents, whereupon the strike was discontinued by the unions. A similar strike was called by the unions on February 18, 1935, against Peacock Cleaners & Dyers, Ltd., and settled on March 5, 1935. Similar attempts to dictate the prices to be charged by Peacock Cleaners were made by the union officials.

From the evidence it further appears that during the period of lockouts and strikes and sometime prior thereto the plaintiff association approached Sommers of the Sterling Cleaners with a view to buying his

business.  Like efforts were made by the plaintiff association to buy out the Peacock Cleaners.  The reason, as stated by plaintiffs' witnesses, was to get rid of the Sterling Cleaners & Dyers so that they could thereafter raise the prices satisfactorily to the plaintiff association, and to eliminate competitors in the dry cleaning business.

It appears that plaintiffs' counsel admitted for the record that this was the purpose and object of the proposed purchase of Peacock Cleaners and Sterling Cleaners.  The attempts to purchase the business of the Sterling Cleaners by the plaintiff association continued as late as the week prior to the filing of the suit herein.  None of the purchases was consummated, because neither the plaintiff association, nor any of its members, were able to raise the necessary cash required.

Numerous witnesses were produced upon the trial of this case by both sides, and many exhibits offered in evidence, and as we have indicated, when the matter was finally before the court upon the master's report, in disposing of the exceptions, which were overruled, the court in its decree finds that the defendants are guilty of unfair competition, unfair trade practices and bait advertising and grants relief by permanently enjoining and restraining both plaintiffs and defendants.

The defendants contend in this case that the court in fixing the price for the industry by injunction did not base its conclusion upon any alleged contract or agreement of the parties, that as a matter of fact none existed between the plaintiffs and the defendants and that there is no evidence in the record to that effect.  It is further contended that there is no statute in force in this State which would in any way authorize the court to fix prices or regulate trade practices in the cleaning and dyeing industry.  The court by its manda-

tory injunction compels all the parties, both plaintiffs and defendants, to this suit, constituting nearly all of the cleaning and dyeing plant owners in Chicago and vicinity, to observe the prices fixed for the industry by the decree, ostensibly for the purpose of eliminating so-called ''unfair competition.'' In doing so, the court compels the defendants to dispose of their services and commodities only at the prices fixed and in the manner provided by the decree.

It is further contended that it seeks to control the industry by supervising labor conditions in the shops and prescribes the method of advertising which the parties may adopt and none other.

For plaintiffs' answer to this contention is that—

''Competition, i. e., the existence of and access to the open market through the legal power freely to contract for the disposal of goods and services, is not an absolute end which stands outside the law, but is a legal construction which the law must conform to changing social needs. Freedom of contract is a social policy, not an absolute value.''

And the plaintiffs again suggest that—

''The absolute conception of free competition as an end outside the law is a rationalization of requirements in the early stage of capitalist economy. It was justified at that time by the economic facts then existing, but is now no longer responsive to present social and economic needs.''

And further the plaintiffs in support of their position state that—

''The doctrine of the 'natural right' to freedom of contract has been used until recently to defeat judicially many restraints on the competitive market required by sound social policy.''

This position of the plaintiffs is not supported by the recognized rules of law governing cases of the kind before us now.

Competition is not of itself a violation of any right of one engaged in a like business. The life of a business enterprise is the sale of its products or services at a price such as will conduce to the disposition of its products by encouraging large sales. The profits will depend largely upon the methods employed in production cost, including economy and the necessary expense in carrying on the business. It is self-evident that large sales necessarily result in large returns, and the profits of course depend upon economical administration cost. To say that the sale of a commodity for a smaller profit results in the destruction of a competitor is not sound. If that were so, the court, upon a showing that a business enterprise was unable to meet competition, would be obliged to consider the question when called upon and to protect such unfortunate merchant. The courts are not concerned with the conduct of a business enterprise unless it appears that those engaged in the business seek by their methods to destroy a business adversary, and that such methods are used only for the evident purpose of driving from the business field a competitor by acts which indicate an intent to destroy and injure.

The fact that a merchant is engaged in a profitable business does not limit the field to such enterprise. The field must necessarily remain open, and the merchant engaged in an enterprise is chargeable with knowledge that he may have to meet competition, and for that reason it will be necessary for him to apply his efforts to withstand successfully the price range for the sale of the products. Fair competition as applied to business covers a wide range. The fact that there are sales for less than those of a like business is not of itself unfair. In order to determine the purpose it is necessary to consider the facts and circumstances concerning such competition, and the court will consider such facts and the reason for cutting the

price, and if the court finds that such price cutting is for the primary purpose of destroying the competing business, then such purpose is not fair competition.

The courts of last resort in this country have considered the question of what would be unfair competition and the law governing such question, and have by the weight of authority approved the doctrine that fair competition of itself is not a violation of any lawful right of a like competitor. "The right to follow any of the common occupations of life is an inalienable right." *Butchers' Union Slaughter-House & Live Stock Landing Co. v. Crescent City Live Stock Landing & Slaughter-House Co.*, 111 U. S. 746; and the price which one may put upon that which he is to sell or lease is a matter wholly his own. *United States v. Trans-Missouri Freight Ass'n*, 166 U. S. 290, 320; *Sears, Roebuck & Co. v. Federal Trade Commission*, 258 Fed. 307.

Again, the fixing of a price for services has been considered in the case of *Wilentz v. Crown Laundry Service Inc.*, 116 N. J. Eq. 40. The court in its opinion makes the following pertinent statement:

"No common law right has been more firmly established or more treasured than the right of the individual to sell his goods or his services at whatever price he and the purchaser might agree upon. Indeed, a few years ago every court in the land would have held that a statute abrogating that right, except in the case of a business or property affected with a public interest, would deprive the individual of his property without due process of law and therefore be void. *Tyson & Brother v. Banton*, 273 U. S. 418, 47 Sup. Ct. 426; *Ribnik v. McBride*, 277 U. S. 350, 48 Sup. Ct. 545; *Williams v. Standard Oil Co.*, 278 U. S. 235, 49 Sup. Ct. 115."

Then again the Supreme Court of Illinois in the case of *People v. Weiner*, 271 Ill. 74, announced this doc-

trine as to right of individuals to pursue a lawful calling:

"Under the Federal and State constitutions the individual may pursue, without let or hindrance, all such callings or pursuits as are innocent in themselves and not injurious to the public. These are fundamental rights of every person living under this government and the legislature by its enactments cannot interfere with such rights. (*Frorer v. People*, 141 Ill. 171; *Ramsey v. People,* 142 id. 380; *City of Chicago v. Netcher,* 183 Ill. 104.)"

In the case of *Frorer v. People,* 141 Ill. 171, the court passed upon the validity of a statute involved in the litigation. This statute limited the right of a company to sell merchandise to its employees. The court said:

"The privilege of contracting is both a liberty and a property right, and if A is denied the right to contract and acquire property in a manner which he has hitherto enjoyed under the law, and which B, C, and D are still allowed by the law to enjoy, it is clear that he is deprived of both liberty and property to the extent that he is thus denied the right to contract. Our constitution guarantees that no person shall be deprived of life, liberty or property without due process of law. (Art. 2, sec. 2.) And says Cooley: 'The man or the class forbidden the acquisition or enjoyment of property in the manner permitted the community at large, would be deprived of liberty in particulars of primary importance to his or their pursuit of happiness.' Cooley's Const. Lim. (1st ed.) 393; *People v. Otis,* 90 N. Y. 48; *People v. Gillson,* 109 id. 398."

In the case of *Anderson & Lind Mfg. Co. v. Carpenters' District Council,* 308 Ill. 488, the court upon the question of right to contract, used these words:

"It is an absolute legal right of every person to carry on any legitimate business and to make and en-

force all lawful contracts in the prosecution of such business. The complainant had a right to operate its mill and sell its product free from molestation for the purpose of injuring it or coercing it to comply with the demand that it should operate a closed shop.'' See also the case of *People v. Steele,* 231 Ill. 340, and *Adams v. Brenan,* 177 Ill. 194.

The courts have always considered the question of price fixing of commodities or services, and have approved the doctrine announced by the Supreme Court of the United States in *National Cotton Oil Co. v. Texas,* 197 U. S. 115. There the court said: ''According to them (the state and national legislature) competition and not combination, should be the law of trade. If there is evil in this it is accepted as less than that which may result from the unification of interests, and the power such unification gives.''

And again, the United States Supreme Court used these words in *United States v. Trenton Potteries Co.,* 273 U. S. 392: ''. . . for whatever difference of opinion there may be among economists as to the social and economic desirability of an unrestrained competitive system, it cannot be doubted that the Sherman law and the judicial decisions interpreting it are based upon the assumption that the public interest is best protected from the evils of monopoly and price control by the maintenance of competition. See *United States v. Trans-Missouri Freight Ass'n,* 166 U. S. 290; *Standard Oil Co. v. United States,* 221 U. S. 1; *American Column & Lumber Co. v. United States,* 257 U. S. 377, 400; *United States v. Linseed Oil Co.,* 262 U. S. 371, 388; *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U. S. 600, 614.''

In our State the Supreme Court in *Distilling & Cattle Feeding Co. v. People,* 156 Ill. 448, upon a like question said: ''No rational purpose for such organization can be shown consistent with an intention to

allow business to run in its normal channels, to give competition its legitimate operation, and to allow both production and prices to be controlled by the natural influence of supply and demand, and the results, as shown by the information, were such as might be anticipated.''

In *Hall v. Woods,* 325 Ill. 114, the Supreme Court said: ''Whatever tends to prevent competition, and thereby restrain trade and create a monopoly, is opposed to public policy and unlawful. Grants and contracts whose tendency is to create a monopoly are void at common law. (*People v. Chicago Gas Trust Co.,* 130 Ill. 268; *Dunbar v. American Telephone & Telegraph Co.,* 224 Ill. 9.)''

In *People v. Aachen & Munich Fire Ins. Co.,* 126 Ill. App. 636, this court said:

''No authority, we think, need be cited in support of the general proposition that combinations and conspiracies in restraint of trade, or to prevent fair competition, are violative of the common law as supplemented by the English statutes in force prior to the fourth year of James the First. This much we understand counsel to concede, but their contention is, that such legislation as is now in force in this State has abrogated the common law rule with respect to combinations and conspiracies in restraint of trade, and that we must now look to this legislation alone to find the public policy of our State with respect thereto.

''This proposition has been decided adverse to counsel's contention, by the Supreme Court, in the very recent case of *C. W. & V. Coal Co. v. The People,* 214 Ill. 421. It is there held that 'the common law as to regulating and fixing prices is in force in Illinois' and that 'a combination to prevent competition . . . is a common law conspiracy.' ''

What was said in the case of *More v. Bennett,* 140 Ill. 69, is pertinent to and somewhat controlling upon

the questions appearing in this record, and in discussing the case, the court said:

"The rule of public policy here involved is closely analogous to that which declares illegal and void contracts in general restraint of trade, if it is not indeed a subordinate application of the same rule. As said by Mr. Tiedeman: 'Following the reason for the rule which prohibits contracts in restraint of trade, we find that it is made to prohibit all contracts which in any way restrain the freedom of trade or diminish competition, or regulate the prices of commodities or services. All combinations of capitalists or of workmen for the purpose of influencing trade in their especial favor, by raising or reducing prices, are so far illegal, that agreements to combine can not be enforced by the court.' Tiedeman on Commercial Paper, Sec. 190. Many cases may be found in which the doctrine here stated has been laid down and enforced. . . . All of the members of the association are engaged in the same business within the same territory, and the object of the association is purely and simply to silence and stifle all competition as between its members. No equitable reason for such restraint exists, the only reason put forward being, that under the influence of competition as it existed prior to the organization of the association, prices for stenographic work had been reduced too far, and the association was organized for the purpose of putting an end to all competition, at least as between those who could be induced to become members. True, the restraint is not so far-reaching as it would have been if all the stenographers in the city had joined the association, but so far as it goes, it is precisely of the same character, produces the same results, and is subject to the same legal objection."

Many cases have been called to our attention by the parties to the appeal now before us, but for this court to cite all of them would be of no particular aid, as

the doctrine applicable to this case upon the question of competition is announced by the courts in the cases above set forth.

The case simmers itself down to whether the facts justify such competition as is evident from the record, and in a general way the plaintiffs do not deny that competition is necessary. The point on which they seem largely to rely is that competition in business must not be such that if used by a competitor it would tend to injure and destroy competitor's adversary. The question then arises whether the purpose of the competition was an unlawful intent to destroy; and, of course, if that was the intent, it was malicious.

The plaintiffs, however, urge that if it is clear there was no malevolent motive in this case in the sense that defendants were motivated by sheer spite, by a desire simply to injure plaintiff with no corresponding benefits to themselves, they were simply doing what they thought was for their own self interest. The malice which was found actionable here therefore consisted in the intentional damaging of plaintiffs' business without just cause or excuse.

The plaintiffs do contend, however, that—"Freedom of contract is no longer a dogma but a problem. The question is not whether freedom of contract should be abolished; nor how much freedom must be allowed the individual on principle, because of his natural inalienable etc., rights; but how must and should the sphere of freedom of the individual be formulated in view of the factual conditions and the changing needs of social economic life."

In the case of *John D. Parks & Sons Co. v. Hartman,* 153 Fed. 24, what was said by the court is a fitting reply to the plaintiffs' contention in the instant case, and we cite it with approval.

"It has been suggested that we should have regard to new commercial conditions and a tendency toward a

relaxation of old common-law principles which tend to prevent development on modern lines. This is an argument better addressed to legislative bodies than to the courts. Neither is it wise for the courts to countenance the introduction of artificial distinctions dependent upon the variant economic views of individual judges. Distinctions which are specious or analogies which are but apparent will but afford opportunities to whittle away broad economic principles lying at the bottom of our public policy, principles which have long received the sanction of statesmen and the approving recognition of a long line of jurists. A like argument is expected whenever some new method of circumventing freedom of commerce comes under the tests of the law. It was made and answered by Judge Taft in the *Addyston Pipe* case with a strength to which we can add nothing." *Addyston Pipe & Steel Co. v. U. S.,* 175 U. S. 211.

In the case of *Schechter Poultry Corp. v. United States,* 55 Sup. Ct. 837, the Supreme Court of the United States added this statement to the letter of the law: "Extraordinary conditions do not create or enlarge constitutional power. . . . Those who act under these grants are not at liberty to transcend the imposed limits because they believe that more or different power is necessary."

The plaintiffs make this significant statement:

"Even if, therefore, there were a combination among the plaintiffs to fix the price in the case at bar, such a combination would be entirely justifiable. Strictly speaking, however, the issues in this case do not involve the power of a combination of producers to fix the price, but the power of a court of equity to prevent a combination of cut-throat competitors from demoralizing the industry by selling below cost."

Perhaps this statement induced the court to enjoin plaintiffs in this case by the provisions of the unusual

order that was entered. This puts the plaintiffs in a position which would indicate that their bill was not properly based upon facts which would justify the relief prayed for, and that from the evidence introduced by them the order of the court was justified. The bill of complaint was filed seeking relief from the oppressive competition of the defendants, which was injuring the plaintiffs in the Cleaning and Dyeing business. Among the plaintiffs is one known as the Cleaning and Dyeing Plant Owners Association of Chicago, a corporation not for profit. The objective of this plaintiff, as appears from the record, was to enroll as members all who were engaged in the cleaning and dyeing business, and it is at present in control of 97 out of 104 or 105 power plants and contends that its purpose through its membership is to control the output. From an examination of the record, it is apparent that plaintiff's purpose was to control the price for services rendered in cleaning and dyeing articles placed in its hands by customers. This is also apparent from the testimony of a Mr. Squires, who was employed by the plaintiffs, and is the presiding officer of this corporation. When called as a witness he stated that where violations were reported to him of plants under contract selling services for less than the recommended price he would ''undertake methods of a persuasive character looking towards getting them to abide by the recommended price.'' And he further stated in his testimony that James P. Gorman was employed as labor commissioner by this plaintiff, who was also president of the Retail Cleaners & Dyers Union; that Gorman was paid a large salary and allowed a sufficient expense account, and that Gorman's duties were to visit the industry with such assistants as he might require to see that the various plants were complying with the wages and conditions. We ask ''Why?'' There is no satisfactory explanation in the

record, except by inference, as strikes were called, property was destroyed by the explosion of bombs and acid thrown to destroy garments in the defendants' stores and other unlawful acts. Is it not strange that the membership of this plaintiff corporation was not molested? No doubt this fact impelled the court to act when it enjoined the plaintiffs.

The record does not show that the conduct of the defendants in their several businesses was for the purpose of injuring the plaintiffs by means of unfair competition; but on the contrary the evidence suggests that the plaintiffs by use of suppressive measures endeavored to create a monopoly in the cleaning and dyeing business in this immediate territory by attempting to compel the defendants to accept and sell at the prices fixed by the plaintiffs, and failing to accomplish this, means were used that led to violence and destruction of defendants' properties. The evidence does not show, as alleged by the plaintiffs, that the defendants sought to destroy plaintiffs' several businesses by unfair competition, nor is this claim supported by evidence of bait advertising or sweatshop practices. The court erred in entering the decree in this case.

The plaintiffs rely largely on the case of *Nebbia v. People of State of New York,* 291 U. S. 502. In this case Nebbia was convicted for the violation of a New York statutory provision which regulated the method of sale of milk to the general public. It is not contended by the defendants in the instant case that a statutory regulation for the control and sale of defendants' services was violated. The public policy of this State remains the same, in that courts cannot control the price at which a merchant's commodity that is not of general public interest, is to be sold, and the court can only interfere when the sale price is fixed so as to intentionally destroy competing business. The *Nebbia* case would probably be of comfort to the plaintiffs if

a regulatory measure had been adopted by the Illinois Legislative body.

Considerable comment is made by the plaintiffs in citing the opinion of this court in the case of *Chicago Laundry Owners Ass'n v. American Wet Wash Laundry, Inc.*, 276 Ill. App. 604 (Abst.). This case was heard on appeal from an order granting a temporary injunction. The question considered was, did the bill of complaint upon its face justify the restraining order entered by the court, and this court in passing upon that question held that the order was justified upon the facts charged in the sworn bill of complaint. The rule is that the case is not disposed of upon the merits, but the injunction is issued only to maintain the *status quo* until a final hearing is had upon the merits. Then again, in that case the defendants were members of the plaintiff association and sought to raise the question in this court that the price provided for was a violation and tended to create a monopoly, but being members of the association they were properly charged with consenting to the by-laws, and this court held that such question could not be raised on the hearing, and it was properly denied this right. It is to be noted that in the opinion of this court we stated:

"The cause was referred to a master in chancery to take evidence and report conclusions and the matter is still pending before him, and we are informed on oral argument that the taking of evidence is still in process. We are now holding only that under the circumstances there was no abuse of discretion on the part of the chancellor, who could rightly hold that the benefits derived from continuing the injunctions would be greater than those which would follow should they be dissolved."

We have considered the case above mentioned and the other cases cited, and do not regard them as being helpful upon the questions presented upon appeal in the instant case.

The plaintiffs complain that by false and deceptive advertising in connection with the unfair methods of competition they were injured. The court may consider the facts surrounding a transaction to determine whether there was intentional injury. By reason of the fact that this court has determined in this case that the defendants were not properly chargeable with unfair competition with intent to destroy plaintiffs' business, it will not be necessary to comment upon the character of defendants' advertising matter, except to say that the subject under discussion is largely controlled by the matter set up through the medium of advertising. It does not appear that the purpose of the advertising medium was to mislead the buying public and to represent that the services rendered by the defendants were like the cleaning methods used by the plaintiffs, or that the defendants' methods were better than those of the plaintiffs. The purpose of the advertising plan was to inform the public that the defendants were furnishing cleaning services at the price named in the advertisement. From the printed matter used, the statements were not misleading, but used to put the defendants' wares and services before the public, and such advertising does not come within the rule of ''palming off'' services as being a product of the plaintiffs, nor does such advertising, standing alone, as we have indicated, afford the plaintiffs a remedy such as prayed for in their bill of complaint.

It is necessary to merely make a short comment upon the charge that the defendants operate their respective plants by means of so-called sweatshop methods—in other words, the employees are required to work to an extent hardly endurable, and that it is wrong to operate by this severe sweatshop method.

The defendants contend, however, that the plaintiffs do not claim that the several shops are operated by

the defendants in violation of the existing laws pertaining to the health, safety and comfort of the employees, nor of the factory inspection laws, at least there is no evidence in the record that the sanitary condition is bad; but rather that in order to accomplish the great amount of work required of defendants' employees in pressing dresses and suits, sweatshop methods are employed. However, after examining such evidence we do not feel that by reason of the claimed sweatshop methods of the defendants there was a violation such as would aid a conspiracy by unfair competition to destroy the plaintiff's business.

The claim of the defendants for damages is based upon the reversal by this court of the temporary injunction issued in the case of *Cleaning & Dyeing Plant Owners Ass'n v. Sterling Cleaners & Dyers, Inc.*, 278 Ill. App. 70, wherein we stated our reasons for such reversal.

Defendants' claim for assessment of damages was referred by the trial court to a master in chancery, and after evidence was submitted, the master filed his report, and also a supplemental report therein, recommending that the court deny any and all damages claimed by the defendants, save the amount of $1,021.27 allowed for attorneys' fees and necessary costs and expenses incurred in the presentation of the interlocutory appeal to this court. The trial court, however, approved the master's original and supplemental report except as to that part of the report wherein the court allowed the representative, Robert W. McKinlay, trustee in bankruptcy of the defendant Sterling Cleaners & Dyers, Inc., an additional sum of $750 for damages sustained by this defendant by reason of the wrongful issuance of the temporary injunction, as stated above.

From the final orders, the defendants, Peacock Cleaners & Dyers, Ltd., and Abarbanell Bros., Inc., prosecuted several appeals, which will be considered with the plaintiffs' cross appeal from the order awarding a judgment for damages of $750 to the defendant Robert W. McKinlay, Trustee in Bankruptcy of Sterling Cleaners & Dyers, Inc.

The procedure followed is found in ch. 69, Injunctions, sec. 12, Ill. State Bar Stats. 1935, which provides:

"In all cases where an injunction is dissolved by any court of chancery in this State, the court, after dissolving such injunction, and before finally disposing of the suit, upon the party claiming damages by reason of such injunction suggesting, in writing, the nature and amount thereof, shall hear evidence and assess such damages as the nature of the case may require, and to equity appertain, to the party damnified by such injunction, and may award execution to collect the same: Provided, a failure so to assess damages shall not operate as a bar to an action upon the injunction bond."

The court having passed upon the exceptions to the master's report, disallowed the damages claimed by all of the defendants, except as to the claim filed by McKinlay, trustee in bankruptcy of the Sterling Cleaners and Dyers, Inc.

The amount of damages claimed by the defendant Peacock Cleaners & Dyers, Ltd., covers a wide range of from $13,703 to $20,292.82, and if, as appears from this record, the defendant is uncertain as to the amount of damages sustained by it, then evidently the trial court was not in a position to determine the amount, and this court cannot fix the amount with certainty. For us to pass upon the amount of damages appearing from the record would place upon the Appellate

Court the burden of doing what the trial court should have done.

As to the claim of Abarbanell Bros., Inc., from this record we find the amount claimed is $9,254.09 for loss of gross profits during the period the temporary injunction was in force and effect. Just what is meant by gross profits is not altogether clear. If this figure is the net amount of the profits during the period, then this defendant should have suggested the fact. From an examination of the facts as they appear in the record on the trial of the case on its merits, we find this defendant has stressed the point that it was not selling its services below cost, as evidenced by its statement. From this statement this defendant had a net profit for a year's business amounting to $12,448.29. The fact is this temporary injunction was in force during the period of 83 operating days between October 11, 1934, and January 16, 1935, and for this period of time the amount of loss of gross profits claimed was $9,254.09 which is not in keeping with the amount of profit made by this company during the time it sold at the prices complained of. In other words, for a year's period the profits amount to $12,448.29. Therefore the claim for damages amounting to $9,254.09 during the 83 operating days when this injunction was in force does not seem reasonable, and from the facts as they appear we are of the opinion that the court was right in approving the master's report recommending a denial of this claim.

There is only one further question, and that is as to the amount allowed the trustee in bankruptcy of Sterling Cleaners & Dyers, Inc., et al. This defendant claims that it suffered loss to the extent of $32,266.24 during the term the temporary injunction was in force. This amount is based upon the loss of business amounting to $21,208.48. Deducting from this amount the production costs of $8,580.24, the profits lost would be

about $12,261.24. Adding to this amount the loss in value of its capital stock of $20,000, makes the total loss claimed as above stated. In the alternative, however, the judgment should be at least $22,261.24. This amount is reached by adding to the loss of profits of $12,261.24, the balance of $10,000 arrived at by a proposed sale of the business for the sum of $25,000 which sale was not consummated, after the deduction of its liability of about $13,000.

It is evident from the record that this defendant's claim for damages accruing during the time the temporary injunction was in force is based upon the claimed loss of business profits for that period. In the service rendered by the defendant to its customers are many items which were not within the terms of the injunction order, so that when the evidence is considered the result arrived at no doubt included items that should not have been properly charged to the plaintiffs. It is important that the result reached in determining the amount of the profits lost by the defendant should be certain and not based upon speculative value of probable profits alleged to have been lost by the acts of the plaintiffs.

Upon the question of the measure of damages in cases of this character, the Supreme Court in the case of *Landis v. Wolf,* 206 Ill. 392, said:

"It is claimed by appellants, that the court below erred in allowing appellee any damages for injury to his business, and loss of profits therein, while the injunction was in force. It is well settled that, in such cases, damages, which are remote, speculative and incapable of ascertainment cannot be allowed, but where, by the issuance of an injunction, a business is unavoidably suspended and thereby injured, damages may be allowed. It may not be possible to show by demonstration the precise extent of such damages, but profits for a reasonable period next preceding the time, when the

injury was inflicted, may be taken as the measure of such damages, and as the basis of an estimate thereof, leaving the other party to show that, by depression in trade or other causes, they would have been less. (*Chapman v. Kirby,* 49 Ill. 211; *Green v. Williams,* 45 id. 206; *Gerard v. Gateau,* 15 Ill. App. 520.)''

The evidence of the defendants upon the question of damages is not clear, and, as indicated in this opinion, the amounts arrived at are based upon claimed losses or profits during the time the injunction was in force, and largely problematical and speculative. The defendants' business continued to operate during the time the temporary injunction was in force and, as this court has indicated, items of service upon which probable profits were claimed were not affected by the injunction and therefore should not have been considered in arriving at the result. The allowance of the sum of $750 to the Sterling Cleaners & Dyers, Inc., was erroneous, as under the facts and circumstances it was not allowable.

The order of the court entered on July 13, 1935, and the allowance of $750 to Robert W. McKinlay, trustee in bankruptcy, is reversed, and the order, also entered on July 13, 1935, is affirmed as to the Peacock Cleaners & Dyers, Ltd., and Abarbanell Bros., Inc.

For other reasons stated in this opinion, the decree here on appeal entered on July 13, 1935, in the case of Cleaning and Dyeing Plant Owners Association of Chicago, a corporation not for profit, et al., v. Sterling Cleaners & Dyers, Inc., et al., was not a proper one, and being erroneous is reversed.

*Decrees reversed.*

HALL, P. J., and DENIS E. SULLIVAN, J., concur.